**UNITED STATES v. CERTAIN PARCELS OF LAND IN CITY OF PHILADELPHIA, PA., et al.**

Civ. A. No. 11999.

United States District Court
E. D. Pennsylvania.

Aug. 2, 1951.

Gerald A. Gleeson, U. S. Atty., Philadelphia, Pa., C. James Todaro, Sp. Asst. to the Atty. Gen., for plaintiff.

Harold D. Saylor, Philadelphia, Pa., for defendant.

GANEY, District Judge.

This case involves proceedings in condemnation. The question posed is whether the United States, as of March 1, 1951, is entitled to obtain title to the Merchants' Exchange property through such proceedings.

Section 1 of the Act of June 28, 1948, 62 Stat. 1061, 16 U.S.C.A. § 407m, provides in part as follows: "For the purpose of preserving for the benefit of the American people as a national historical park certain historical structures and properties of outstanding national significance located in Philadelphia, Pennsylvania, and associated with the American Revolution and the founding and growth of the United States, the Secretary of the Interior * * is authorized to acquire by donation or with donated funds, or to acquire by purchase, any property, real or personal, within the following-described areas, such park to be fully established as the 'Independence National Historical Park' when, in the opinion of the Secretary, title to sufficient of the lands and interests in lands within such areas, shall be vested in the United States". Then follows a proviso that the park shall not be established until title to certain designated properties, including the Merchants' Exchange property, and two-thirds of the remaining lands contained in the area of the proposed park shall be vested in the United States.

The park will cover roughly the area[1] of the three city blocks located east of the

---

[1] In addition there will be a "memorial thoroughfare" extending from the south side of Walnut Street to the north side of Maning Street, between Fourth and Fifth Streets. Certain lands and buildings immediately adjacent to Christ Church situated on the west side of Second and north of Market Streets will also be included as will the site of Benjamin Franklin's residence, a one-hundred-foot-wide strip of property extending southward from Market Street, and lying between Third and Fourth Streets.

square on which Independence Hall stands, and bounded by Chestnut, Fifth, Walnut and Second Streets, but excluding the United States Custom House at the southeast corner of Second and Chestnut Streets. Housing units and business establishments within this area will be demolished. Buildings of great historical value, such as the Merchants' Exchange[2], located on the southeast corner of Third and Walnut Streets, will be restored and made an integral part of the park[3]. At present the Merchants' Exchange building is known as the Merchants' Produce Exchange. It is being used as an office building with produce stores on the ground floor and a cold storage establishment in the basement; the area outside the building fronting Third and Dock Streets is utilized as a gasoline service station. The building, occupied by approximately twenty-six tenants, is in poor condition. Many of the original fixtures, ornaments and furnishings have been removed or destroyed.

At the request of a representative of the Secretary of the Interior proceedings were instituted on March 1, 1951, pursuant to section 1 of the Act of August 1, 1888, 25 Stat. 357, as amended, 40 U.S.C.A. § 257,[4] to acquire title to twenty-seven parcels of land, including the Merchants' Exchange property, within the area of the proposed park. On the same day a declaration of taking was filed, together with the deposit of the estimated compensation, and judgment and an order of the court was entered thereon. The declaration of taking stated that the properties are required "for immediate use". However the petition in condemnation set forth that the interest sought to be condemned is the full fee simple title to the lands, subject to the following:

"(a) The right of the owners of the Parcel numbered A-4(427–429 Walnut Street), their lessees, successors and

2. The Merchants' Exchange building dates back to 1834. It was designed by one of America's great architects, William Strickland. The building, constructed of Philadelphia marble, is a three-story structure in the shape of a parallelogram, having a frontage of ninety-five feet on Third Street, and a depth of one-hundred and fourteen feet on Walnut Street. There is a semicircular attachment in the rear, with a radius of thirty-six feet, which makes the total length from front to rear one-hundred and fifty feet. The semicircular portion is embellished with a portico of eight Corinthian columns and antae. A circular lantern rises forty feet above the roof. The building is considered as an American architectural masterpiece, and a monument to the Greek Revival Art.

Historically the Merchants' Exchange had its origin in the London Coffee House in the center of Philadelphia's business life from 1754 to 1780. In 1790 a group of brokers and merchants of the London Coffee House formed an association which is known today as the Philadelphia Stock Exchange, the first stock exchange in America. In 1806 they moved their activities to the Merchants' Coffee House, the old City Tavern at Second and Gold Streets. In 1834 they moved to the Merchants' Exchange Building. In the Philadelphia National Shrine Park Commission Report it is stated: "Apart from its notable architecture, the Merchants' Exchange Building has a distinctive place on the American scene. It recalls vividly the courageous days when mariners set forth in wooden ships and a spread of sails to develop America's commerce throughout the world; it speaks of the businessmen who assembled here with supreme confidence in their nation's ability to weather every kind of economic climate. * * * The Merchants' Exchange Building is a historic affirmation of America's traditional freedom of enterprise".

3. Other buildings within the three block area which will be preserved for posterity are Carpenter's Hall, the First United States Bank, the Second United States Bank, the Bishop White house and the Dilworth-Todd-Moylan house.

4. This section, in part, provides: "In every case in which the Secretary of the Treasury or any other officer of the Government [who] has been, or hereafter shall be, authorized to procure real estate for the erection of a public building or for other public uses, he may acquire the same for the United States by condemnation, under judicial process, whenever in his opinion it is necessary or advantageous to the Government to do so * * *".

assigns, to continue to occupy said parcel for a period of five (5) years from the date of the filing of the Declaration of Taking;

"(b) The right of the owners of other parcels as herein described, their lessees, successors, and assigns to continue to use and occupy said parcels for such periods of time and under such terms and conditions as may hereafter be stipulated between the parties".

On April 4, 1951, an answer to the petition in condemnation was filed by the trustees of the estate to which title to the Merchants' Exchange belonged prior to March 1, 1951. The substance of certain paragraphs, or portions thereof, of the answer, which the Government has moved to strike, is that the United States is not presently entitled to obtain title to the property in question by condemnation proceedings because it will not put the property to a public use until a period of five years or more from the date of taking has elapsed.

 It has long been settled that the United States, through its power of eminent domain, has the right to acquire by condemnation sites or buildings of national historical significance for the purpose of preserving them in order to commemorate and illustrate the nation's history. United States v. Gettysburg Electric Railway Company, 1896, 160 U.S. 668, 680–683, 16 S.Ct. 427, 40 L.Ed. 576; Barnidge v. United States, 8 Cir., 1939, 101 F.2d 295, 298–299. Therefore there can be no question at this late date that the government may condemn the property described in the Independence National Historical Park Act in order to "provide a permanent memorial to the principles on which our country is founded."[5]

 The trustees of the estate impliedly admit all this. However they claim that the government should not condemn the Merchants' Exchange property until it is ready to establish the park, or a reasonable short time before then. We cannot agree. From the terms of the Act, it seems to us, that a program of piecemeal acquisition of the land, by donation or purchase, extending over a period of time was intended by Congress; mass eviction during a time when there is a shortage of, and a great demand for, housing units and business establishments in this metropolitan section was certainly not contemplated. Permitting the former owners or their lessees to remain in possession of the properties within the proposed park until the government was ready to take possession is, we think, in harmony with the policy envisioned by the Act. In view of the situation, both here and abroad, and in the absence of any allegation and proof of bad faith on the part of the government officials, the waiting of a period of five years until the property will actually be put to the use cited in the Act is not unreasonable, and will not defeat the government's right to condemn the property on March 1, 1951. See United States v. 6,576.27 Acres of Land, etc., S. W.D. of N.D.1948, 77 F.Supp. 244.

Moreover since the government intends to preserve and restore the Merchants' Exchange Building and make it a part of the park project, obtaining title and control over that property at an early date by the proper government agency for the purpose of preventing further deterioration, changes or alterations, and reducing the risks of its impairment or destruction by fire or storm is reason enough.

██ Another reason suggested by the government for its early acquisition of the property in question is that it desires to prevent speculation in the properties within the area of the proposed park. Whether this reason, standing alone, may be a sufficient ground for condemning the Merchants' Exchange property on March 1, 1951, we need not decide. However as an additional factor it does not detract from the government's right to obtain immediate title and control of that property on that date. For as stated in United States ex rel. T. V. A. v. Welch, 1946, 327 U.S. 546, at page 554, 66 S.Ct. 715, 719, 90 L.Ed. 843: "The cost of public projects is a relevant element in all of them, and the government,

5. See 2 U.S.Code Cong.Service (1948), p. 2095.

718

just as anyone else, is not required to proceed oblivious to elements of cost. Cf. Old Dominion Land Co. v. United States [269 U.S. 55, 46 S.Ct. 39, 70 L.Ed. 162]. And when serious problems are created by its public projects, the Government is not barred from making a common sense adjustment in the interest of all the public. Brown v. United States, 263 U.S. 78, 44 S.Ct. 92, 68 L.Ed. 171".

 The fact that the beneficial interest in the property was divided between a life tenant and a remainderman cannot create any obstacle or deterrent to the government's right to obtain title by condemnation proceedings. It only creates a problem when the time for the distribution of the proceeds arrives. See United States v. 380 Acres of Land, D.C.Ky.1942, 47 F. Supp. 6.

Accordingly, the government's motion to strike certain paragraphs, or portions thereof, of the trustees' answer will be allowed.