**UNITED STATES**

v.

**CERTAIN PARCELS OF LAND IN CITY OF PHILADELPHIA et al.**

**No. 11273.**

United States Court of Appeals, Third Circuit.

Argued April 19, 1954.

Decided Aug. 12, 1954.

Lewis M. Stevens, Philadelphia, Pa., (George V. Strong, Seth W. Watson, Jr., Merritt N. Willits, 3rd, Philadelphia, Pa., on the brief), for appellants.

John C. Harrington, Washington, D. C. (Perry W. Morton, Asst. Atty. Gen., W. Wilson White, U. S. Atty., Philadelphia, Pa., Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before BIGGS, Chief Judge, and GOODRICH and McLAUGHLIN, Circuit Judges.

BIGGS, Chief Judge.

The creation of an "Independence National Historical Park" to consist of certain historical buildings located near Independence Hall in the City of Philadelphia was authorized by Congress in 1948. See 62 Stat. 1061, as amended, 16 U.S.C.A. § 407m et seq. The Secretary of the Interior was authorized by the Act creating the Park to acquire particular historical buildings and an area of approximately three city blocks to be made into a Park. One of the historical buildings described in the Act was the "Merchants' Exchange property" located on a city block bounded by Third Street, Walnut Street and Dock Street, in the City of Philadelphia. The Merchants Exchange is one of five properties mentioned in the Act as properties to be acquired and maintained for their historical interest in the setting of the new National Historical Park.

On March 1, 1951, the United States filed a declaration of taking covering the Merchants Exchange property and a number of other properties included within the area of the new Park. The government deposited $200,000 in the registry of the District Court as estimated just compensation for the Merchants Exchange. The present appel-

lants, the owners of the Merchants Exchange, filed an answer in opposition to the proposed condemnation. The court below in substance overruled the owners' objections, in an opinion filed August 2, 1951. See 99 F.Supp. 714. The court then proceeded to appoint Commissioners to try and determine the issue of just compensation. See Rule 71A(h), F.R. C.P. 28 U.S.C. The Commissioners returned their Report on March 23, 1953, setting the fair market value of the Merchants Exchange as $309,000. The court below, for reasons to be stated later in this opinion, returned the Report to the Commissioners for specific additional findings. The Commissioners made a further Report to the court below on September 24, 1953, reaffirming the sum of $309,000 as the fair value of the property. The court below affirmed the new Report on November 18, 1953. The appeal at bar followed.

The Merchants Exchange was built in 1833 and 1834 to be used as an exchange building by an association of Philadelphia merchants. The Exchange was designed by William Strickland, the foremost American architect of the time, and was constructed of Pennsylvania marble. The building was completely remodeled and fireproofed in 1898 for use by the Philadelphia Stock Exchange for its pit and for offices for its members. The Philadelphia Stock Exchange used the building until 1914. Since that time it has been employed as an office building. In addition to the office building proper, the property condemned, on the date of taking, also consisted of a cold storage space in the basement, seven one-story brick market stores facing Dock Street, and a gasoline service station located on the southeast corner of Third and Dock Streets. The Merchants Exchange is located on the edge of a large wholesale fruit and produce market area, and several of the uses of the building, including the basement cold storage space, are associated with that industry.

The main question on this appeal involves the measure of compensation used by the Commissioners in arriving at their estimate of just compensation. The Commissioners heard extensive testimony from experts in real estate valuation, both for the United States and for the condemnees. The testimony ranged over several bases for valuation, including replacement cost and capitalization of rental income. The standard of valuation most relied upon was capitalization of rental income. In their first Report, the Commissioners summarized all the testimony given by the experts in a careful manner. As has been stated, the Commission's conclusion was that a fair value for the property at the time of the taking was $309,000. The last two sentences of the Commissioners' first Report described how the Commissioners arrived at this figure: "If, therefore, the income formula is to be used and adopted by the Commissioners in arriving at the fair market value of the subject property on the date of condemnation, it cannot logically be argued that the space in the building should be appraised on the basis of the $2.25 per square foot figure [the highest rental offered by a prospective tenant], and the Commissioners feel that an overall average for all the space in the building should not exceed a $2.10 per square foot valuation at the time of taking. Accordingly, using that figure and employing the method of computation used by the experts of the owners, which the Commissioners find to be fair, the valuation of the subject property on the date of taking, to wit, March 1, 1951, would approximate $309,000.00."

The "method of computation" used by the experts of the owners, to which the Commissioners referred, is a capitalization of the rental income of the building. The owners' experts first took the total space, in square feet, available for renting and multiplied this figure by $2.50, the amount the experts estimated to be a fair rental per square foot for the office space as of the date of taking. From the total thus obtained, the experts then deducted certain costs of operation. Some of these costs of operation are fixed, in the sense that they do not vary

according to the rent per square foot obtained for the space. On the other hand, it is argued that three elements of operating cost vary directly with the rent per square foot obtained. These cost elements are depreciation, management expense, and vacancy expense. It is asserted that it is customary in the business of operating office buildings, similar to the Merchants Exchange, in Philadelphia to base depreciation expense on total rental income, after the estimated number of years of useful life of the building have been determined. Similarly, management expenses are estimated at 5% of total rental income. An estimate of the expense of vacancies is arrived at by multiplying an estimated percentage of the available space which will lie vacant by the fair rental value per square foot of the vacant space. The computation presented by the owners' experts is set out in the first column of the footnote.[1] A similar estimate based

1.

### TABLE OF VALUES

#### Applying Income Method of Valuation

| | Owners' Appraisers @ $2.50 per square foot | Commissioners' Computation @ $2.10 per square foot | Correction of Commissioners' Computation @ $2.10 per square foot—land at $89,000.00 |
|---|---|---|---|
| **Statement of Income and Expenditures** | | | |
| **Rental Income** | | | |
| Offices | $ 60,000.00 | $ 50,400.00 | $ 50,400.00 |
| Service Station | 1,800.00 | 1,800.00 | 1,800.00 |
| Stores | 3,075.00 | 3,075.00 | 3,075.00 |
| Cold Storage Plant | 3,200.00 | 3,200.00 | 3,200.00 |
| | $ 68,075.00 | $ 58,475.00 | $ 58,475.00 |
| **Average Expenditures** | | | |
| Taxes | $ 3,968.65 | $ 3,968.65 | $ 3,968.65 |
| Water and Sewer Rent | 250.00 | 250.00 | 250.00 |
| Fuel | 2,000.00 | 2,000.00 | 2,000.00 |
| Gas and Electric Service | 2,000.00 | 2,000.00 | 2,000.00 |
| Insurance | 870.00 | 870.00 | 870.00 |
| Salaries | 10,000.00 | 10,000.00 | 10,000.00 |
| Social Security and Unemployment Insurance | 500.00 | 500.00 | 500.00 |
| Maintenance and Rehabilitation | 2,000.00 | 2,000.00 | 2,000.00 |
| ** Management (5% of income) | 3,400.00 | *3,400.00 | 2,923.74 |
| ** Vacancies (1000 square feet) | 2,500.00 | *2,500.00 | 2,100.00 |
| ** Depreciation | 7,350.00 (2.1019% on $350,000.00 building value) | *7,350.00 | 5,457.47 (2.1019% on $259,644.80 building value) |
| Miscellaneous Expenses and Supplies | 2,000.00 | 2,000.00 | 2,000.00 |
| Total | $ 36,838.65 | *$ 36,838.65 | $ 34,069.86 |
| Net Income | $ 31,236.35 | *$ 21,636.35 | $ 24,405.14 |
| Capitalization | $446,234.00 | $309,000.00 | $348,644.80 |

\* Indicates incorrect computations.
\*\* Indicates variables.

upon a fair rental value of $2.10 per square foot, the figure suggested by the Commissioners' Report, is set out in the third column of footnote 1 to indicate what the computation would have been had rental income been capitalized on the basis of $2.10 per square foot. It is asserted by the owners that it is possible to arrive at the $309,000 estimated by the Commissioners, using a figure of $2.10 per square foot, if the expenses of depreciation, management expense, and vacancy expense are incorrectly based upon the figures the owners' experts originally used, based upon $2.50 per square foot. This computation is set out in the second column of footnote 1.

The condemnees argue that an obvious mistake has been made and that they are entitled to have that mistake corrected here. If the last two sentences of the Commissioners' Report, quoted above, are taken to be a full statement of the Commissioners' reasoning in arriving at the $309,000 figure, there is something to be said for the position of the owners.

The condemnees first raised this objection alleging a mistake in computation in exceptions to the Commissioners' first Report. The court below affirmed this first Report but later sent the Report back to the Commissioners for a reconsideration of the point raised by the condemnees. The court's order of reference is set out in the footnote.[2]

As was stated above, the Commissioners produced a second Report in response to this order of the court. In this second Report the Commissioners denied that they had arrived at a figure of $309,000 by any method of simple arithmetic based upon capitalization of a $2.10 rental income. The Commissioners said that they had not limited their estimate of valuation to rental income alone but had " * * * 'given diligent and conscientious consideration to *every piece of evidence and testimony submitted to them for that purpose* * * *'* The income approach, and specifically the $2.10 per square foot rental figure was used only as a guide in checking the amount unanimously agreed upon, namely, approximately $300,000.00. Specifically, the Commissioners never intended that each and every figure used by the Owners' experts reflected the absolute, exact and accurate basis for its computation. It did, however, subscribe to the *method* employed. We again desire to stress that this procedure was used solely and only for checking purposes." (Emphasis is the Commissioners'.) The Commissioners reaffirmed their award of $309,000.

The condemnees wish us to reject this second Report as "meaningless". They argue that: "This second report was filed six months after the first report, and it is clearly nothing more than an attempt to rationalize an obvious mistake in the original report and to support retroactively a valuation of $309,000 on grounds consistent with the opinion of Judge Welsh. If the reasoning of the Commissioners in the second report is anything other than that, it is hard to explain why the alleged use of the capitalization of income method only as a guide was not mentioned in the first report, and why the Commissioners did not say in the first report that prior to their drafting of that report they had decided the value of the property was approximately $300,000."

But the first Report, taken in its entirety, does not indicate that the Commissioners relied exclusively on a capi-

2. "And Now, to wit, this 9th day of June, A.D., 1953, after considering defendants' motion to amend the judgment heretofore entered, it is Ordered, Adjudged and Decreed that the cause be and the same is hereby returned to the Commissioners with direction to said Commissioners to find specifically whether the average expenditures as testified to by the owners' experts with respect to Management, Vacancies and Depreciation are to remain the same or be decreased (and if decreased the amount of the decrease), in view of said Commissioners finding of a lower office rental income than that testified to by the owners' experts. The Commissioners may ascertain said facts from the record *as it now exists* or they may take additional testimony if required."

talized rental income of $2.10 per square foot in arriving at their estimate of $309,000. The first Report is 30 pages long. It summarizes the testimony of all of the witnesses and discusses in detail a number of elements of value having nothing to do with rental, such as sales of nearby office buildings, historical value of the Merchants Exchange, the past history of real estate development in the section of Philadelphia in which the Merchants Exchange is located, and the future possibilities of real estate in that area. As the Commissioners stated in their second Report, the first Report itself declares that all the evidence was considered. Finally, even the final two sentences of the first Report quoted above do not say that the Commissioners used a figure of $2.10 per square foot but rather that "an overall average for all the space in the building *should not exceed* a $2.10 per square foot valuation at the time of taking." (Emphasis added.) We conclude that the Commissioners' first Report and second Report, taken together, indicate that many elements of value were taken into consideration and the $309,000 figure was not the result of a simple arithmetical computation.

In arguing that the first Report is "meaningless", the owners are insisting that the figure of $309,000 could have been arrived at only by making the mistake in computation pointed out in our footnote 1. This is not necessarily true for the amount arrived at by the Commissioners might have been a pure coincidence. But even if the long arm of coincidence may not fairly be deemed to reach so far and the Commissioners actually arrived at the $309,000 figure in the way the owners suggest they did, the Commissioners' valuation is nevertheless sustainable if in fact all the other elements having nothing to do with rental were actually taken into consideration by the Commissioners. The important point, however, is that the Commissioners in their second Report emphasize that $309,000 was their fair estimate of the value of the Merchants Exchange, with each and every element of value considered. This statement by the Commissioners constitutes an explanation of what they did and how they did it, and in the absence of an allegation of bad faith, which the owners do not make, the Commissioners' computation should stand. Cf. Baetjer v. United States, 1 Cir., 1944, 143 F.2d 391, at page 394; United States v. Hirsch, 2 Cir., 1953, 206 F.2d 289, 294. And see United States v. Miller, 1943, 317 U.S. 369, 374, 763 S.Ct. 276, 87 L.Ed. 336.

■ The owners also object that the court below did not make separate findings of fact and conclusions of law. Before August 1, 1951 findings and conclusions were not required in condemnation cases. See Baetjer v. United States, 1 Cir., 1944, 143 F.2d 391, 394. This was true because the Federal Rules of Civil Procedure did not apply to proceedings in condemnation. See former Rule 81 (a) (7), F.R.C.P. Findings and conclusions in ordinary civil cases are required by Rule 52 F.R.C.P. Rule 71A, F.R.C.P., effective August 1, 1951, however, had the effect of applying Rule 52 to condemnation cases. Rule 71A sets out a form of procedure to be followed in all condemnation proceedings under federal law, and a clause in the rule expressly makes all other consistent federal civil rules applicable in federal condemnation proceedings. Therefore, Rule 52 now requires findings of fact and conclusions of law to be made in condemnation cases.

■ But findings of fact need not be in any particular form. See 5 Moore, Federal Practice, p. 2664. So long as the opinion of the court below sets out clearly what the findings of fact were, Rule 52 has been effectively complied with. 5 Moore, supra, at pp. 2643–2644. The two Reports of the Commissioners in this case contain extensive and detailed discussions of the factual evidence, together with the findings of the Commissioners. Both reports were expressly adopted by the court below. This procedure corresponds to the handling of findings of fact usually employed by masters. See Rule 53(e) (2), F.R.C.P.

Reports of commissioners in condemnation proceedings must be treated similarly. See Rule 71A(h), F.R.C.P.

The owners next complain that they were prejudiced by the rulings of the court below, contained in an opinion dismissing objections to the first Report of the Commissioners, viz., that the historical nature of the Merchants Exchange and the effect of news of the proposed condemnation were elements not properly to be considered in valuing the property. The government in its brief apparently admits that these are factors that should be considered in a valuation proceeding, and both parties seem to agree that these factors were considered by the Commissioners in rendering their first Report. The owners point out, however, that although the district court adopted the Report of the Commissioners, in its opinion the court in a contradictory phase rejected these elements as factors properly entering into the consideration of valuation.

▉ Nonetheless this error of the court below may be obviated by our reliance on the Commissioners' Reports. Rule 71A(h), F.R.C.P., under which the instant proceeding was conducted, provides that the Commissioners' " * * * findings and report shall have the effect, and be dealt with by the court in accordance with the practice, prescribed in paragraph (2) of subdivision (e) of Rule 53." Rule 53(e) (2) states that "[i]n an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous." Consequently, the review of the Commissioners' Reports by the district court is properly a limited one. See United States v. Waymire, 10 Cir., 1953, 202 F. 2d 550, 553. Since both we and the court below must rely on a dead record, this court will apply the correct rule of law to the Commissioners' Reports and reach a correct final judgment thus obviating the error of the court below. Cf. First National Bank & Trust Co. of Racine v. Village of Skokie, 7 Cir., 1951, 190 F.2d 791, 796.

We may not conclude, as the owners maintain, that they were "materially prejudiced" on the issue of valuation because the lower court stated in its opinion that historical value and the effect of the proposed condemnation were not elements properly entering into the consideration of the worth of the property. Putting it bluntly, the Commissioners disregarded the court's conclusions of law and after the second reference stated in their second Report that they had given " * * * consideration to *every piece of evidence and testimony submitted to them for that purpose.*" It seems clear therefore that the historical significance of the Merchants Exchange and the effect of the proposed condemnation were considered by the Commissioners and that the owners were not prejudiced by the opinion of the district court stating that these factors were irrelevant. It follows that the conclusion as to valuation made by the Commissioners may be and it is sustained on this ground.

The owners contend further that the condemnation was itself improper inasmuch as a portion of the property taken was not to be devoted to "public use" within a reasonable period of time. As we have stated the Merchants Exchange tract was but one of a large number of tracts condemned or to be condemned by the government in establishing the Independence National Historical Park. The particular condemnation proceeding in which the Merchants Exchange property was involved covered many separate tracts. Other pieces of land remained to be condemned. One of these properties, condemned at the same time as was the Merchants Exchange, was taken subject to a provision allowing the owner to remain in possession for a period of five years. A provision allowing similar arrangements in respect to other lands then taken was included. The owners of the Merchants Exchange, a property still largely occupied by private tenants, argue that the National Historical Park "as a completed whole" could not come

into being until at least five years after their property was condemned and that this constituted an unreasonable delay after the time of taking.

The court below ruled to the contrary for good reasons. The court concluded that since the authorizing legislation anticipated a "program of piecemeal acquisition" [99 F.Supp. 717] of the necessary properties,[3] the government reasonably deemed such a transitional program administratively desirable for such a large project and more feasible for the tenants who had to make arrangements to conduct their business in other localities. In addition, the obtaining of early control of the properties enabled the government to prevent unsatisfactory alteration, deterioration, or destruction of the site and also avoided speculation.

We do not, however, consider it necessary to evaluate these reasons. Since the power of eminent domain is limited in its exercise to obtaining property for public use, the courts have reviewed eminent domain proceedings in order to insure that the property condemned was actually taken for public use. Admittedly, the proposed National Historical Park is a public use. Though there may be some delay in diverting the property from private uses the delay should not be great in the light of all the circumstances.

■■ Once it is administratively determined that a property is to be taken for a public use, a United States court ordinarily will not review the reasonableness of the government's decision as to the time of taking or the period which must elapse before the property is utilized solely for a public activity. In authorizing the use of eminent domain in such a case as that at bar 40 U.S.C.A., § 257 provides that the " * * * officer of the Government * * * authorized to procure real estate * * * may ac-

quire the same for the United States by condemnation, under judicial process, *whenever in his opinion it is necessary or advantageous to the Government to do so, * * *.*"* (Emphasis added.) The statute indicates that the judgment as to the proper time of taking is to be that of the government official to whom the exercise of the power of eminent domain has been delegated by Congress. See United States v. 6,576.27 Acres of Land, D.C.N.D.1948, 77 F.Supp. 244, 245. The administrative difficulties in having a court sit in judgment on such an exercise of official discretion and the disadvantages of such a course would seem to limit severely the role a court may play save where there has been a clear abuse of discretion. Cf. United States v. State of New York, 2 Cir., 1947, 160 F.2d 479, 481. Once it has been determined that the property taking is for a public use, only with reluctance will the court review any other administrative decisions involved, such as the desirability of the particular property, United States v. Willis, 8 Cir., 1954, 211 F.2d 1, the quantity of land necessary, United States v. Kansas City, Kan., 10 Cir., 1946, 159 F.2d 125, 129, or the particular estate required in the property taken, Simmonds v. United States, 9 Cir., 1952, 199 F.2d 305, 306. And on hearing an objection to the government's selection of a particular property for a public use, the Supreme Court has said: "In this case, it is unnecessary to determine whether or not this selection could have been set aside by the courts as unauthorized by Congress if the designated officials had acted in bad faith or so 'capriciously and arbitrarily' that their action was without adequate determining principle or was unreasoned. The record presents no such issue here." See United States v. Carmack, 1946, 329 U.S. 230, 243, 67 S.Ct. 252, 258, 91 L.Ed. 209,

**3.** 16 U.S.C.A. § 407m provides in part: "*Provided,* That the park shall not be established until title to the First United States Bank property, the Merchants' Exchange property, the Bishop White house, the Dilworth-Todd-Moylan house,

and the site of the Benjamin Franklin house, together with two-thirds of the remaining lands and interests in lands within the following-described areas, shall have been vested in the United States: * * *.*"*

Similarly, in the instant case, no such issue is presented.

The owners rely heavily on Clendaniel v. Conrad, 1912, 3 Boyce, Del., 549, 83 A. 1036, at page 1049, a Delaware condemnation proceeding, wherein the court said, that property taken by eminent domain must " * * * be devoted to a public use within a reasonable time * * * " after the taking. The court explained that this requirement was enforced as a means of compelling private groups, allowed the eminent domain power, without directions as to its exercise, to use the fruits of the power only for public purposes and that acceptance of the eminent domain power by a private corporation not only imposed a duty to devote private property taken with the power to public use, but to do so within a reasonable time. The court ruled that this duty would be judicially enforced when necessary. Because the eminent domain power delegated to private groups has always been more closely limited than that inherent in sovereignty, the precedent of the Clendaniel decision is not persuasive here. See United States v. Jotham Bixby Co., D.C.S.D.Cal.1932, 55 F.2d 317, 319.

The owners of the Merchants Exchange next point to the discrepancy between the amount deposited by the Secretary of the Interior at the time of the taking, $200,000, and the estimates of value, $225,000, $249,000, and $250,000, made by the expert witnesses for the government testifying at the hearing before the Commissioners. From this the owners argue that the declaration of taking itself should be set aside, citing the case of United States v. 44.00 Acres of Land, D.C.W.D.N.Y.1953, 110 F.Supp. 168. Suffice it to say that the cited case is clearly distinguishable from the facts of the present condemnation. There, the original estimated compensation in the amount of $500,000 was reduced by the government without explanation to $300,-000. Also, the condemnees had made an allegation of bad faith in moving to have the declaration of taking set aside. No justly comparable factors are present in the instant proceeding. In this case the government deposited as estimated just compensation an amount only $25,000 less than the lowest amount designated by the government experts. As we have indicated a court will not ordinarily review the amount of estimated just compensation deposited in the absence of bad faith. Bad faith is not charged here. The grounds offered are insufficient to justify the setting aside of the declaration of taking.

The judgment of the court below will be affirmed.