Elizabeth SMALLS

v.

Howard S. IVES, Individually and as Highway Commissioner of the State of Connecticut.

Civ. No. 12609.

United States District Court
D. Connecticut.

Nov. 8, 1968.

449

Stephen L. Fine, Westport, Conn., Jonathan W. Lubell, Lubell & Lubell, New York City, for plaintiff.

Robert K. Killian, Atty. Gen., Jack Rubin, Clement J. Kichuk, Asst. Attys. Gen., Hartford, Conn., for defendant.

Before SMITH, Circuit Judge, and BLUMENFELD and CLARIE, District Judges.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

Plaintiff brings this suit to challenge the constitutionality of Conn.Gen.Stats. § 48–23 because on its face it allows the state to be put into possession of condemned property (1) without requiring prior notice and a hearing for occupants on the land and (2) without requiring that the state first provide suitable relocation housing.[1]  Jurisdiction is based

1. Conn.Gen.Stats. § 48–23 reads in full: "When, under the provisions of any statute authorizing the condemnation of land in the exercise of the right of eminent domain, and appraisal of damages has been returned to the clerk of the superior court, as provided by law, and when the amount of appraisal has been paid or secured to be paid or deposited with the state treasurer, as provided by law, any judge of the superior court may, upon application and proof of such payment or deposit, order such clerk to issue an execution commanding the sheriff of the county to put the parties entitled thereto into peaceable possession of the land so condemned."

on 28 U.S.C. § 1343(3), (4). A three-judge district court was convened and has heard this case pursuant to 28 U.S.C. §§ 2281 and 2284.

### Facts

Plaintiff, Elizabeth Smalls, is a black citizen of the United States of the State of Connecticut. She is the indigent mother of five small children who live with her in a small house at No. 4 Lynes Place in Norwalk, situated on land which has been condemned by the Connecticut highway department to make way for the Route 7 highway project. This land was condemned on October 21, 1965.[2] At that time plaintiff was a tenant of the owner, but not a lessee of record, and so not a party to the condemnation proceeding.[3]

After the condemnation, plaintiff remained in occupancy with the state's permission on the condition that she pay an occupancy fee of $135.00 per month (the same amount she had been paying the former owner as rent), and that she vacate the premises when the state was ready to enter into possession.[4]

Late in 1966 plaintiff was notified that the highway department would need the land and that she should seek relocation assistance. The assistance afforded will be discussed later with her claims relating to the adequacy of the assistance.

On June 5, 1968, the state desired immediate possession of the premises in order to demolish the house and to fill the area pursuant to its road-building project. It caused plaintiff to be served with notice to show cause why the state should not be put into possession. The hearing in the Superior Court was to be held on June 20th, but was continued pending amendments to the pleadings. Meanwhile, on July 3rd, a hearing on plaintiff's motion to convene a three-judge district court was held in the United States District Court in Hartford. On July 11th, Judge Clarie postponed the proceedings here pending the outcome of the state court hearing. On August 8th, the Connecticut Superior Court ruled against plaintiff's challenges to § 48–23, and ordered the clerk to issue an execution commanding the sheriff to put the highway commissioner into peaceable possession of the land condemned. The next day plaintiff filed a notice of intent to appeal from that order, resulting in an automatic stay of execution. On August 26th, the state moved for a termination of this stay on the ground that plaintiff did not intend to appeal, but merely filed the notice for the purposes of delay. This motion was heard on September 3rd, and judgment in favor of the state was rendered on September 12th. In the meantime, plaintiff, fearing that judgment would allow her immediate eviction and thus render her claims before the federal court moot, cf., e. g., Simmons v. Housing Authority, 396 F.2d 954 (2d Cir. 1968), sought a temporary restraining order in the federal district court.[5] This was granted on

2. Pursuant to Public Act 309, Conn.Gen. Assembly, February 1965 Special Session.

3. *See* Conn.Gen.Stats. § 48–21.

4. Plaintiff soon fell behind in her payments ($1600.00 by June 1968), and so for the past year the state welfare department has been paying plaintiff's rental allotment directly to the state highway department.

5. The mootness issue was of concern to the court when it issued the temporary restraining order. Although plaintiff anticipated that this court's assumption of jurisdiction would be objected to on the ground that 28 U.S.C. § 2283 prohibits a federal court from enjoining state court proceedings unless expressly authorized by statute, that objection was never made. Plaintiff argued in its brief that 42 U.S.C. § 1983, upon which this action is based, is an express exception to the prohibition of § 2283. This point has deliberately been left open by the Supreme Court. *See* Cameron v. Johnson, 390 U.S. 611, 613–14 n. 3, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); Dombrowski v. Pfister, 380 U.S. 479, 484 n. 2, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Barber v. Kinsella, 277 F.Supp.

September 10th. After further hearing, the temporary restraining order was continued until a three-judge district court could be convoked to hear the case.

### The Rights Involved

■ In deciding what process is due whenever state action affects the rights of a party, "[t]he nature of the alleged right involved * * * must be taken into account." Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 (1960). The power of eminent domain is one of the paramount attributes of sovereignty, and its exercise is perhaps the prime example of a situation in which the interest of the public predominates over the interest of the individual. It has long been held that the right to condemn property is an inherent attribute of sovereignty, which does not depend for its existence on any express provision of constitutional or statutory law. It is limited only by the requirement embodied in a clause of the fifth amendment to the United States Constitution and in article first, § 11 of the Connecticut Constitution, that the state pay just compensation. *E. g.*, Albert Hanson Lumber Co. v. United States, 261 U.S. 581, 587, 43 S.Ct. 442, 67 L.Ed. 809 (1923); United States v. 658.59 Acres of Land, 224 F.Supp. 645 (W.D. Pa.1963); United States v. 29.40 Acres of Land, 131 F.Supp. 84 (D.N.J.1955); E. & F. Const. Co. v. Ives, 156 Conn. 416, 420, 242 A.2d 768 (1968).

■ It is well settled that notice and a hearing are required in proceedings to *fix compensation*. *E. g.*, Walker v. City of Hutchinson, 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956). It is equally established that possession by the condemnor need not await the final determination of the amount of compensation. *E. g.*, Bragg v. Weaver, 251 U.S. 57, 40 S.Ct. 62, 64 L.Ed. 135 (1919); Backus v. Fort Street Union Depot Co., 169 U.S. 557, 18 S.Ct. 445, 42 L.Ed. 853 (1898).

Notice and hearing are required only with respect to that portion of the proceedings which relate to the determination of just compensation, and are not required with respect to the actual taking of the land. As the Supreme Court stated in Bragg v. Weaver, 251 U.S. at 58, 40 S.Ct. at 63:

> "Where the intended use is public, the necessity and expediency of the taking may be determined by such agency and in such mode as the State may designate. They are legislative questions, no matter who may be charged with their decision, and a hearing thereon is not essential to due process in the sense of the Fourteenth Amendment."

*See also* United States v. Southerly Portion of Bodie Island, 114 F.Supp. 427, 430 (E.D.N.C.1953): "Neither notice nor an opportunity to be heard is a prerequisite to the exercise of the power of eminent domain."

A case in point is Bailey v. Anderson, 326 U.S. 203, 66 S.Ct. 66, 90 L.Ed. 3, *rehearing denied*, 326 U.S. 691, 66 S.Ct. 228, 90 L.Ed. 407 (1945). In that case the Court upheld the constitutionality of a state statute that allowed the highway commissioner to enter on the land, construct the highway, and then, within 60 days of the completion of the highway, commence condemnation proceedings to fix compensation. The Court stated:

> "But it has long been settled that due process does not require the condemnation of land to be in advance of its occupation by the condemning authority, provided only that the owner have opportunity, in the course of the condemnation proceedings, to be heard and to offer evidence as to the value of the land taken." *Id.* at 205, 66 S.Ct. at 67.

In the case at hand, plaintiff makes no claim that she is entitled to compensation. In fact, since her only interest in the land was as an occupant by permission of the state, no conceivable claim

72, 75 n. 5 (D.Conn.1967). In the absence of any objection to these proceedings based on § 2283 and because on

our disposition of the case the issue is not reached, we do not decide this point.

that she is entitled to be a party to the proceedings to determine compensation can be imagined. Only if she did would she have been entitled to notice and a hearing as a matter of due process.

Thus, the intendment of § 48–23, restraining the commissioner from taking immediate possession of condemned property without resorting to further judicial action, is to modify the harshness which might otherwise follow from the forcible exercise of the state's near-total sovereign power; it is not to create rights in a holdover tenant of the former owner.

Even in light of the foregoing, however, the case cannot be disposed of easily by concluding that this plaintiff was not entitled to any procedural safeguards at all. For in this case, the state did not merely condemn and then take the necessary steps required to enter into possession. Rather, it entered into a use and occupancy agreement with plaintiff. Although a new use and occupancy agreement between the holdover tenant and the highway commissioner, made after title and the right to possess have vested in him through the condemnation proceedings, may not significantly alter the tenant's obligation to pay for continued use and occupancy absent such agreement, her continuation in possession has been specifically consented to and its value has been agreed to. While this may be slight and perhaps not an interest in land of such dignity that it is a substantive property right, *cf*. Flemming v. Nestor, 363 U.S. 603, 610–611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960), it is nonetheless of sufficient substance that the courts may well entertain a suit to protect it against arbitrary termination without notice. The nonexistence of a substantive "property right" does not alone establish the absence of a right to fair procedure. The courts have not restricted the protection of the fourteenth amendment's due process clause to "property" in the conventional sense. *Cf*. Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed.

692 (1956); United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

### Notice and Hearing

Plaintiff's main attack on Conn. Gen.Stats. § 48–23 is that it violates the due process clause because on its face it does not provide for notice and a hearing prior to execution. Plaintiff concedes that she did in fact have notice and a hearing, in the form of a hearing on an order to show cause; but she claims that this notice and hearing was gratuitous and, therefore, does not save the statute. She cites in support of her contention Coe v. Armour Fertilizer Works, 237 U.S. 413, 35 S.Ct. 625, 59 L.Ed. 1027 (1915); Central of Georgia Ry. Co. v. Wright, 207 U.S. 127, 28 S.Ct. 47, 52 L.Ed. 134 (1907); and Security Trust & Safety Vault Co. v. City of Lexington, 203 U.S. 323, 27 S.Ct. 87, 51 L.Ed. 204 (1906).

The subject matter of § 48–23 is epitomized in its title, "Obtaining possession of land acquired by eminent domain." The provision that "any judge of the superior court may, *upon application*" issue an order to put the condemnor in peaceable possession of the land condemned has furnished a sure guide to the purpose of the statute to invoke a judicial proceeding. (Emphasis added). The customary procedure in employing the statute was followed. A judge's order to show cause why execution should not be issued against the plaintiff was ordered served upon her by a judge of the Superior Court, and a date for a hearing was fixed. Taken together, these steps provide a coordinate, reasoned and fair procedure.

The Supreme Court of Connecticut has already addressed itself to the effect of the absence of a specific notice provision in a condemnation statute. In New Haven Water Co. v. Russell, 86 Conn. 361, 365, 85 A. 636, 638 (1912), the court said: "When the condemnation statute makes no provision for notice, the law will imply the giving of notice and action under the statute can be had

only upon giving reasonable notice." [6] It is clear that Connecticut's courts and the highway commissioner have followed this principle in applying § 48–23. We hold that § 48–23 is not unconstitutional for lack of a specific notice provision.

### Equal Protection

■ Notwithstanding there is process which is adequate to satisfy the due process requirement of the fourteenth amendment, the plaintiff advances the additional argument that any process less than that given to secure the eviction of one in possession of land acquired by purchase denies her equal protection of the laws. Plaintiff contends that there is an invidious discrimination because of the different procedures to evict occupants of land which the state acquires by purchase, to whom the normal summary process statute applies,[7] and occupants of land acquired by condemnation, to whom § 48–23 applies. It is claimed that the former get the benefit of notice and a hearing and a possible six-month stay of eviction; that the latter get none of these; and that there is no rational relation between how the state acquires the property and how the occupants are treated procedurally.

"When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed." Morey v. Doud, 354 U.S. 457, 464, 77 S.Ct. 1344, 1349, 1 L.Ed. 2d 1485 (1957). The fact that there may be different methods of obtaining possession depending on method of acquisition of title does not mean that such discrimination in treatment as exists is necessarily an invidious discrimination. The legislature may recognize that in purchasing property the state may bargain for terms and times of delivery of full possession, while in a taking by condemnation the terms must necessarily be set by court action. In federal condemnations, "[o]nce it is administratively determined that a property is to be taken for a public use, a United States Court ordinarily will not review the reasonableness of the government's decision as to the time of taking or the period which must elapse before the property is utilized solely for a public activity." United States v. Certain Parcels of Land in City of Philadelphia, 215 F.2d 140, 147 (3d Cir. 1954). Here, after the state fulfilled its constitutional obligation in the taking of the property by condemnation, the time when it could obtain actual possession was fixed by the court, after hearing both parties. Equal protection does not demand that the practice of the state, in allowing former tenants to remain on a use and occupancy basis until the last minute before demolition is actually necessary, must be conditioned on its use of the same summary process others must use. Insistence on procedural steps set up for ordinary tenancies would delay public projects at substantial

---

6. *See also* 1 Nichols, Eminent Domain § 4.103(1) : "Legislatures rarely specifically enact that notice need not be given, but frequently inadvertently fail to make any provision for notice in statutes authorizing the taking of land by eminent domain. In such cases it is sometimes contended that the statutes are unconstitutional and the takings void, even though notice was actually given, but the great weight of authority is in favor of the validity of a taking in such a case. The duty to notify the owners is sometimes inferred from other provisions of the statute relating to a hearing or, if this cannot be done the familiar maxim that a statute should, if possible, be construed as constitutional is brought

into use, and as the legislature has not expressed itself one way or the other it is assumed that the serving of a reasonable notice was intended. While there are doubtless grave practical difficulties in the application of this rule, no court which really intended to abide by the fundamental principles of constitutional government as they were understood when the power of the courts to set aside acts of the legislature was established, would fail to find some means of enforcing a statute which neglected to provide for notice in such a way as to avoid the necessity of declaring it to be unconstitutional." (Footnotes omitted).

7. *See* Conn.Gen.Stats. § 52–532.

loss and would force the state invariably to start proceedings to remove all occupants at the earliest possible moment. Instead of alleviating individual hardship, it would aggravate it in many cases.

It is obvious that there is a difference between the use of property for public purposes and its use for private benefit. It is equally obvious that the distinction between the procedure to secure the eviction of an occupant from privately owned property and that provided to secure his eviction from state property to be devoted to public use is neither arbitrary, capricious, nor invidious. *Cf.* Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968); Morey v. Doud, *supra;* Smith v. Cahoon, 283 U.S. 553, 51 S.Ct. 582, 75 L.Ed. 1264 (1931). Although the legislature might well have made the ordinary summary process procedure available to obtain possession of condemned property, it instead provided a special statute. We cannot say that this amounted to a denial of equal protection.

### Thirteenth Amendment

Plaintiff also contends that since the state is holding open only one apartment into which she can move, and since she is a black person, she is being denied a freedom of choice in housing and that this denial constitutes a "badge of slavery" prohibited by the thirteenth amendment. The argument is in language inappropriate to the case; it is completely baseless in fact and law. The facts involve no real issues of racial discrimination, nor is the case tainted with any racial overtones, except that the plaintiff happens to be a black person. Her eviction under § 48–23 arises simply because she, like many others, resides in the path of a proposed highway. She asks the court not to treat her as it would treat a white person, but rather that the court adopt a special rule for the benefit of Blacks. In this respect plaintiff's reliance on Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), is misplaced. That case established equal rights for Blacks in the rental and purchase of housing. It did not involve granting black persons greater rights than other citizens would have.

### Right to Shelter

Plaintiff's argument that, since § 48–23 does not require the state to show that suitable alternative housing is available before an occupant is dispossessed, the statute is unconstitutional on its face is two-pronged: it deprives her of a substantive right to shelter; and, shelter is a property right which can only be taken after payment of just compensation, namely, other shelter. Plaintiff cites several cases that have outlawed racial discrimination and denials of equal protection in housing. *E. g.,* Jones v. Alfred H. Mayer Co., *supra;* Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). While the right to buy or rent housing may not be denied to Blacks or other minority groups, the Constitution does not affirmatively require the states to provide housing for its citizens. That expectations should rise and that positive concrete changes to satisfy them should be made is desirable. But there has not been such a complete readjustment of values as to require payment in kind for property taken by condemnation, or relocation in equal housing facilities of occupants dispossessed. In Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920 (2 Cir. 1968), which seems destined to become a landmark case in this area, the court broke new ground in holding that a congressional enactment providing for relocation of dwellers displaced by local redevelopment agencies utilizing federal funds under urban redevelopment programs gave to those so displaced standing to sue for the protection of their interest in the establishment and administration of a proper plan for relocation. But no case has yet declared that there is a constitutionally protected right to shelter, and that the state must provide it.

### Statutory Rights to Relocation Housing

■ Plaintiff claims that § 48–23 deprives her of the right to suitable relocation housing guaranteed by 23 U.S.C. § 133 and by Conn.Gen.Stats. § 13a–81. However, these statutes do not provide such a right. Title 23 U.S.C. § 133 provides that prior to approval of a federal-aid highway project by the Secretary of Commerce, the state highway department must give satisfactory assurance that relocation *advisory assistance* shall be provided for the relocation of families. This statute is merely a precondition for federal approval of a project and does not prescribe a prerequisite to state procedures for entering into possession of land taken for highway purposes. Furthermore, it only speaks of relocation advisory assistance, not of providing actual housing.

Connecticut Gen.Stats. § 13a–81 requires that the highway commissioner provide the city with a map of its proposed construction, and that the city then prepare a relocation plan showing the number of units displaced, the availability of suitable accommodations, and a plan for relocating occupants. Thus, the city, not the state highway department, is obliged to make a relocation plan; and the evidence shows that this has been done. Furthermore, the last sentence of § 13a–81(b) says: "Nothing in this section shall be construed to limit, restrict or derogate from any power, right or authority of the commissioner contained in any other statute to proceed with the planning, design, acquisition of property and construction of any state highway to be constructed, reconstructed or relocated as originally planned." Therefore, there is nothing inconsistent between this statute and § 48–23.

### Relocation Assistance

■ Late in 1966 plaintiff was notified that the highway department would need the land and that she should seek relocation assistance. She contacted the Norwalk Housing Authority and her case was handled by a relocation officer for a housing agency under contract with the city. On at least two occasions in 1967 plaintiff was offered other housing through this officer. She was offered an apartment in "Roodner Court," a public housing project, but she refused the apartment because she did not want to live in public housing. She was offered a place in "Meadow Gardens," but plaintiff refused to live there because her children would have to go to school with children from Roodner Court.

In April of 1968 plaintiff did apply for public housing. In the middle of June she was shown an apartment in "Washington Village." A family had recently moved out and the premises were dirty. Plaintiff refused the apartment because it was dirty. The apartment was subsequently cleaned, completely repainted and refloored. However, plaintiff has not gone back to see it, but asserts that it is not suitable because the bedrooms are too small and because it is on the second floor. She states that she is not supposed to climb stairs more than a few times a day.

At all times plaintiff has expressed a desire to move into "Colonial Village." However, there is and has been no vacancy there. In addition, because the apartments there are duplexes, it appears that the stair-climbing situation would be no better there than in Washington Village. The bedrooms in Washington Village are fairly small; but they are not so small as to be unsuitable for plaintiff's family. Three-bedroom apartments, which plaintiff's family needs, are extremely scarce in Norwalk. Recognizing this, the state has held open for plaintiff and is still holding open the apartment in Washington Village.

It would appear, then, that the state has made commendable efforts to locate suitable housing and is holding for plaintiff an apartment which, although not ideal, is certainly suitable, especially considering the scarcity of housing in that city. Thus, she has not been nor is there any reason to believe that she will be deprived of shelter.

**456**

### Conclusion

To sum up, there is no merit to the plaintiff's claims that she has been denied due process or equal protection. She has not established the existence of any constitutional or statutory right to shelter. She has not proved that she will suffer irremediable injury from the operation of the state's process to place the highway commissioner into peaceable possession of No. 4 Lynes Place, Norwalk.

The stay heretofore granted is terminated.

The application for an injunction is denied.

The case is dismissed.